## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| LARRY BARTH, <br><br> PLAINTIFF, <br><br> V. <br><br> MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, <br><br> DEFENDANT. | CIVIL NO. 11-304 (JRT/AJB) <br><br><br> **REPORT & RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |

Dennis W. Hagstrom, 309 South Mill Street, Suite 105, P.O. Box 1074, Fergus Falls, MN 56537, for Plaintiff.

B. Todd Jones, United States Attorney, David W. Fuller, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415, for Defendant.

## <u>INTRODUCTION</u>

Plaintiff Larry Barth disputes the unfavorable decision of Defendant Commissioner of Social Security (the "Commissioner"), denying his protective applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court, Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636(b)(1); D. Minn. L.R. 72.1-2.

For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (Docket No. 16) be granted in part and denied in part and the Commissioner's Motion for Summary Judgment (Docket No. 19) be denied. This Court recommends the case be remanded for further proceedings consistent with this opinion.

# FACTS

## I.    BACKGROUND

Mr. Barth was 54 years old at the time he filed his application for benefits.  (*See* Tr. 127.)
Mr. Barth graduated from high school and completed two year of technical education.  (Tr. 33, 161.)

Mr. Barth last worked in February 2008, at which time he was self-employed as a carpenter.  (Tr. 33, 176.)  Mr. Barth had worked as a carpenter from 1974 to 1998 and from 2003 until he stopped working in February 2008.  (Tr. 176, 211.)  Mr. Barth's work history also included work as a telemarketer and telemarketer supervisor from 1999 to 2002.  (Tr. 35, 176, 211.)

Mr. Barth stopped working on February 13, 2008, the alleged disability onset date, when he slipped on ice and injured his shoulder.  (Tr. 33-34, 176.)  Mr. Barth did a limited amount of carpentry work in July and September 2008, but his earnings did not rise to the level of substantial gainful activity.  (Tr. 198.)

## II.   RELEVANT MEDICAL EVIDENCE

### A.    Mr. Barth's Treatment Records

The following section summarizes Mr. Barth's medical records.  This summary excludes irrelevant information.[1]

### 1.    Mr. Barth's shoulder issues

In February 2008, Dr. Gary Mislan, Mr. Barth's long-term physician, began treating Mr. Barth for a right shoulder injury that he suffered when he slipped and landed directly on his right

---

[1]    Throughout the period in question, Mr. Barth was diagnosed and treated for conditions not discussed in this summary, including hypertension, hyperlipidemia, and left thumb osteoarthritis.  The ALJ noted that Mr. Barth did not allege that these conditions affected his ability to perform basic work activities and found that such impairments are not severe.  (Tr. 17.) Therefore, such conditions are not discussed in this Report and Recommendation.

outstretched arm.  (Tr. 249, 243.)  An MRI was performed on February 20, 2008, which revealed a significant right rotator cuff tear.  (Tr. 244-45.)  Mr. Barth underwent arthroscopic rotator cuff repair surgery performed by Dr. Matthew Friederichs on March 4, 2008.  (Tr. 242, 357.)  Mr. Barth was prescribed pain medication following the surgery.  (Tr. 242.)  He also was referred to a physical therapy program.  (Tr. 241.)

By April 2008, Mr. Barth's shoulder was "doing well" and his physical therapy was "going great."  (Tr. 241.)  Mr. Barth reported that the surgery had been very successful.  (Tr. 221.)  In May 2008, Mr. Barth reported that his shoulder was "doing very well" and denied any problems.  (Tr. 240.)  Dr. Friederichs noted that Mr. Barth had recovered from his recent shoulder surgery and had almost full range of motion.  (Tr. 238.)  Mr. Barth had full forward elevation and abduction, with full strength (5/5) in all planes.  (Tr. 240.)  On May 23, 2008, Dr. Friederichs released Mr. Barth to very light duty work, with no heavy construction.  (Tr. 240.)  Mr. Barth also was to transition from physical therapy to a home exercise program.  (Tr. 240.)

Mr. Barth next saw Dr. Friederichs for follow-up on his shoulder surgery in August 2008.  (Tr. 398.)  Mr. Barth reported that he had "a little dead spot" with straight abduction, but otherwise was doing very well.  (Tr. 398.)  At that time, Mr. Barth was back doing most activities at work as a carpenter.  (Tr. 398.)  In December 2008, Mr. Barth reported pain and a "dead area" in his right shoulder when bringing his arm out to the side.  (Tr. 455.)  Otherwise, he had full range of motion and strength was good in all planes.  (Tr. 455.)  Overall, Dr. Friederichs assessed that Mr. Barth was doing well.  (Tr. 455.)

2.   Mr. Barth's back issues

Mr. Barth has a history of six back surgeries, the most recent of which was an L5-S1 spinal fusion and laminectomy in 2002 performed by Dr. David C. Holte.  (Tr. 280, 257.)  Mr.

Barth had the hardware from the 2002 surgery removed in 2004 due to pain. (Tr. 257.) In March 2004, Dr. Holte completed a report of work ability for Mr. Barth that specified permanent work restrictions of working 4-8 hours per day; lifting 25-50 pounds; sitting, standing, and walking intermittently; and changing positions every 20 minutes. (Tr. 409-10.) Dr. Holte recommended that Mr. Barth could do no more than sedentary work. (Tr. 409.)

On November 28, 2007, Dr. Mislan treated Mr. Barth for acute lower back pain. (Tr. 257.) Dr. Mislan noted with respect to Mr. Barth's back that he "ha[d] done actually really quite well up until recently." (Tr. 257.) Mr. Barth had recently developed sudden severe pain in the lumbosacral spine into the lateral hip and leg. (Tr. 257.) Dr. Mislan noted that the pain seemed to be associated with nerve root irritation and that if Mr. Barth continued to have problems, he would need to undergo an MRI. (Tr. 257.) Dr. Mislan prescribed anti-inflammatories. (Tr. 257.)

In December 2007, Mr. Barth underwent a MRI scan of his lumbar spine. (Tr. 253.) The MRI showed multi-level mild disc bulges and degenerative facet disease, with mild narrowing of the spinal canal, but no nerve root impingement. (Tr. 253.) Mr. Barth had degenerative changes with post-surgical change at L5-S1, where there was scar formation and moderate narrowing of the right neural foramen, and mild foraminal compromise at L4-5. (Tr. 253.) After the MRI, Dr. Mislan noted that Mr. Barth's pain had been getting progressively worse in the right hip and leg. (Tr. 252.) Dr. Mislan referred Mr. Barth to Dr. Sunny Kim at the Central Minnesota Spine Center for further evaluation. (Tr. 281.)

On April 17, 2008, Mr. Barth was seen by Dr. Kim with a complaint of lower back pain with radiation into the right leg. (Tr. 280.) Dr. Kim noted that Mr. Barth had done well after his 2002 back surgery until approximately December 1, 2007, when he had a sudden onset of pain

4

after a day of activity at a farm.  (Tr. 280.)  Mr. Barth's lower back and right leg pain thereafter

had gotten somewhat better, to a "more tolerable level."  (Tr. 281.)  His pain was aggravated by

extensive walking and bending over.  (Tr. 281.)  Upon examination, Dr. Kim noted that range of

motion of the lumbar spine was moderately limited in all directions.  (Tr. 282.)  Dr. Kim's

review of the MRI scan indicated moderate stenosis above the previous fusion and Dr. Kim

diagnosed transitional syndrome at L4-L5.  (Tr. 282.)  Dr. Kim recommended that Mr. Barth

undergo a weight-bearing myelogram and noted that if there was significant stenosis, Mr. Barth

may benefit from extending the fusion to L4.  (Tr. 282.)

Mr. Barth sought treatment for lower back pain, among other issues, from his

chiropractor on two occasions in March and April 2008.  (Tr. 221, 421.)  In March 2008, Mr.

Barth reported difficulty with increased lower back pain when he sat for too long and with

bending.  (Tr. 221.)  In April 2008, Mr. Barth stated that "overall he ha[d] been doing quite a bit

better."  (Tr. 421.)  He continued to have lower back pain with some activity, but his symptoms

had improved since his last visit.  (Tr. 421.)

Mr. Barth saw Dr. Kim for a follow-up visit on May 23, 2008.  (Tr. 279.)  Dr. Kim

reviewed the myelogram and observed that Mr. Barth had a small central disc herniation at L4-

L5.  (Tr. 279.)  Dr. Kim concluded that it was not severe enough to recommend spinal fusion

surgery at that time.  (Tr. 279.)   Dr. Kim recommended a lumbar discogram and noted that if

low back and right leg pain were present, he would be a candidate for extension of the fusion to

L4.  (Tr. 279.)

On August 1, 2008, Mr. Barth was seen by Dr. Kim.  (Tr. 392.)  Dr. Kim reviewed the

results of a CT discogram and noted concordant pain reproduction at L4-L5 with degeneration

and epidural leakage of the dye, and transitional syndrome at L4-L5 above the previous fusion at

L5-S1.  (Tr. 392.)  Dr. Kim recommended extension of Mr. Barth's L5-S1 fusion to L4.  (Tr. 392.)

Mr. Barth next sought treatment for back pain in December 2008 from his chiropractor. (Tr. 420.)  Mr. Barth stated that his pain levels were not severe or limiting, but that he experienced a "deep, achy" pain, which became worse with certain movements.  (Tr. 420.)

Mr. Barth was seen by Dr. Timothy Nyarandi for lower back pain on April 3, 2009.  (Tr. 503.)  Mr. Barth reported worsened pain over the last two days, with pain radiating to the right lower extremity.  (Tr. 503.)  Mr. Barth rated the pain as 10/10 and reported the pain was worse with movements and walking.  (Tr. 503.)  His lower back pain was made worse with recent lifting of heavy weights while repairing a friend's basement.  (Tr. 503.)  Dr. Nyarandi advised Mr. Barth to take hydrocodone for pain and avoid heavy lifting.  (Tr. 503-04.)

Mr. Barth also sought chiropractic treatment on the same day.  He stated that he experienced lower back pain after shoveling snow for four hours two days prior to the appointment.  (Tr. 419.)  He experienced sharper pain the next day when working on a sump pump, with bending forward and leaning to the side.  (Tr. 419.)  He had difficulty sleeping the previous night and upon waking, "could hardly stand up" due to severe pain in the paralumbar area.  (Tr. 419.)

On April 22, 2009, an MRI scan of Mr. Barth's lumbar spine showed a small disc protrusion at L4-L5, with possible compression of the traversing right L5 nerve root.  (Tr. 428.) There was mild to moderate multilevel degenerative disc and facet changes throughout the lumbar region and multilevel mild disc bulging, without additional obvious focal nerve root compression.  (Tr. 428-29.)  These changes were in comparison to the MRI conducted in December 2007.  (Tr. 428.)

Dr. Mislan saw Mr. Barth for back-related issues on May 21, 2009.  (Tr. 495.)  Dr. Mislan noted that Mr. Barth "ha[d] been pretty much pain free up until the past 2 months."  (Tr. 495.)  Mr. Barth complained of lower back pain, initial referred pain in the right leg, and left leg pain.  (Tr. 495.)  Mr. Barth next saw Dr. Mislan for back issues in July 2009, at which time he complained of back pain, mostly stiffness with no radiculopathy.  (Tr. 490.)

In August 2009, Mr. Barth was again seen by Dr. Kim.  Mr. Barth reported continued lower back pain and some leg pains.  Dr. Kim reviewed the April 22, 2009 MRI scan and noted that it showed a small disc protrusion at L4-L5.  (Tr. 412.)  Dr. Kim discussed with Mr. Barth doing a minimally-invasive "XLIF" fusion at L4, which would have a quicker recovery than the conventional fusion technique.  (Tr. 412.)  Mr. Barth stated that he wished to proceed with the surgery, would set it up, and would like to do the surgery in November 2009.  (Tr. 412-13.)   As of the date of the hearing, the surgery had not taken place.  (Tr. 37.)

In November 2009, Mr. Barth was seen at his chiropractor clinic on an emergency basis after falling off of a roof and landing on his back.  (Tr. 418.)  He was suffering from sharp lower back pain, with difficulty walking, and headache.  (Tr. 418.)

       3.       <u>Mr. Barth's knee issues</u>

Prior to the claimed period of disability, Mr. Barth had right total knee replacement.  (Tr. 213.)  When Mr. Barth was seen for follow-up on the surgery on October 17, 2006, the assessment was that Mr. Barth had "done well," the replacement was well-aligned, and he had good motion in the knee.  (Tr. 213.)

On August 13, 2008, Mr. Barth complained of a click in the front of his right knee.  (Tr. 398.)  He denied any other significant problems and had no significant pain associated with his

knee. (Tr. 398.) Bilateral standing knee images revealed that the knee replacement appeared to be in good position and alignment, without evidence of complications. (Tr. 396-98.)

        4.    <u>Mr. Barth's migraine headaches and syncope</u>

Mr. Barth has a history of migraine headaches, which he has controlled with various medications. (Tr. 275, 277.)

On May 20, 2008, Mr. Barth sought treatment at an emergency room after developing an intense headache and "blacking out" for two hours. (Tr. 222, 225.) Mr. Barth reported that he had experienced three similar episodes over the last several weeks. (Tr. 225.) A head CT was performed, which revealed a normal exam. (Tr. 227.) He was treated with Toradol. (Tr. 226.) Upon examination by Dr. Mislan a few days later, Dr. Mislan opined that Mr. Barth's "blinding headaches" could be caused by a CSF leak related to Mr. Barth's recent myelogram. (Tr. 238.)

On June 11, 2008, Mr. Barth again sought treatment for these symptoms. (Tr. 378.) He reported feeling his heart race, a profound headache, chest pressure, and syncope of varying lengths on approximately six occasions during May and June 2008. (Tr. 378.) An electroencephalogram ("EEG") was performed, which revealed a moderate, nonspecific cortical dysfunction in the left midtemporal region. (Tr. 465.) The physician reviewing the EEG indicated that the results were suspicious for having epileptiform potential. (Tr. 465.)

Dr. Mislan evaluated Mr. Barth on July 15, 2008. (Tr. 529.) Mr. Barth complained of continued migraine headaches on the left side, for which he used Topamax 100 mg daily as a preventive measure. (Tr. 529.) Dr. Mislan reviewed the EEG and other evaluations and concluded that there was not enough information to make a diagnosis of a seizure disorder. (Tr. 529.) Dr. Mislan's treatment plan was to get better control of Mr. Barth's migraine therapy. (Tr.

529.)  Dr. Mislan prescribed injectable Imitrex to be taken at the onset of a migraine and increased the Topamax to 150 mg daily.  (Tr. 529.)

### 5.    Mr. Barth's carpal tunnel syndrome

Mr. Barth has a history of carpal tunnel syndrome and has undergone carpal tunnel release on both hands on two occasions.  (Tr. 329.)  Mr. Barth's first carpal tunnel release surgeries were in December 2005 and January 2006, respectively, on the right and left hands. (Tr. 290.)  Mr. Barth did well for several months following the surgeries, but sought treatment beginning in October 2006 for recurrent symptoms in his right hand and beginning in January 2007 for recurrent symptoms in his left hand.  (Tr. 290-92, 296-302.)  His physician recommended repeating the carpal tunnel release procedures.  (Tr. 324.)  Mr. Barth's second carpal tunnel release operations took place in June 2007.  (Tr. 327, 337.)  Mr. Barth experienced relief from his symptoms following the release surgeries.  (Tr. 343-44, 350.)

On July 23, 2009, Mr. Barth was seen by Dr. Mislan for a complaint of right hand pain and stiffness.  (Tr. 490.)  Dr. Mislan noted that Mr. Barth had "multiple arthritic issues" and described "right hand osteoarthritic of the MP joints and triggering of the [fourth] finger."  (Tr. 490-91.)  Dr. Mislan prescribed a trial of diclofenac.  (Tr. 491.)

Mr. Barth next sought treatment for bilateral hand pain and weakness on November 4, 2009.  (Tr. 474.)  Mr. Barth reported losing grip strength in his right hand.  (Tr. 474.)  Dr. Mislan noted that Mr. Barth had done "fairly heavy work" and that "his hands show a lot of deformity and joint changes consistent with arthritis" and that Mr. Barth had "increasing hand pain and weakness."  (Tr. 474-75.)  Dr. Mislan's examination revealed reduced grip strength, swelling of the thumb joints, and deformity of all fingers.  (Tr. 474.)

An electrodiagnostic evaluation ("EMG") was performed on November 23, 2009.  (Tr. 422-23.)  The findings indicated that the right median motor was unchanged compared to the preoperative study conducted in January 2007, with continued absence of response in the right median and ulnar sensory studies.  (Tr. 422-23.)  The left hand median sensory and motor distal latencies had improved compared to the preoperative studies.  (Tr. 423.)  The physician interpreting the EMG stated that the findings "suggest[ed] the possibility of a recurrent carpal tunnel syndrome on the right."  (Tr. 423.)  Dr. Mislan reviewed the evaluations with Mr. Barth on November 27, 2009 and noted that carpal tunnel disease "appear[ed] to be a problem" and that although Mr. Barth "did improve following treatment," he currently was "not doing well."  (Tr. 468.)  Dr. Mislan recommended a referral to Dr. Bailey, who conducted Mr. Barth's most recent carpal tunnel surgeries.  (Tr. 468.)

6.      Mr. Barth's heart disease

Mr. Barth has a history of seeking emergency medical treatment for ischemic heart disease, specifically for chest pain and related symptoms.  (Tr. 232-37, 263, 265, 320-21.)  Testing in 2007 revealed that no cause of the chest pain could be identified, with normal electrocardiogram and chest x-rays.  (Tr. 234, 313.)  Dr. Mislan concluded in June and July 2007 that these recurrent episodes were somatization of symptoms and the result of a panic disorder manifested as chest pain.  (Tr. 263, 265.)  Dr. Mislan prescribed Lexapro and encouraged Mr. Barth not to go to the hospital unless there was some specific change.  (Tr. 265.)

In May and June 2008, Mr. Barth sought treatment for syncope with related chest pressure, as discussed above.  (Tr. 238, 360-62.)  Mr. Barth complained on May 21, 2008 that with over-exertion, he became short-of-breath and experienced chest pain.  (Tr. 360.)  Mr. Barth stated that he "can deal with it" and that "if he relaxes the pain decreases and 'goes away pretty

good.'"  (Tr. 360.)  On May 23, 2008, Mr. Barth reported to Dr. Mislan that he "has not had any chest pain or shortness of breath."  (Tr. 238.)  A cardiac PET study on June 2, 2008 revealed activity within normal limits, with no evidence of infarct or ischemia.  (Tr. 373.)

### B.    Mr. Barth's Disability Report and Testimony

As part of the application process, Mr. Barth submitted a Disability Report.  (Tr. 174-84.) Mr. Barth reported the following conditions that limited his ability to work:  "back trouble, carp[a]l tunnel both arms, and knee problems, blockage in [four] arteries, problems with right shoulder, high cholesterol, very severe migraine headaches, low thyroid."  (Tr. 175.)  Mr. Barth described how these conditions limited his ability to work:

> I have a hard [time] breathing due to the problems with my heart. I am unable to work at all due to the shoulder problems.  I have constant pain in my back and right leg due to the problems with the back.  The headaches put me down in bed for a day to three days in a row.  I can't l[i]ft or carry anything.

(Tr. 175.)

Mr. Barth testified before the Administrative Law Judge (ALJ) regarding these conditions as follows.  Since his right rotator cuff surgery in March 2008, Mr. Barth has a dead spot in his shoulder when he holds his arm out to the side and his shoulder bothers him when he tries to lift anything heavy.  (Tr. 36.)  He has a history of six back surgeries dating from 1984, with the most recent surgery occurring in 2002.  (Tr. 36-37.)   He had a major fusion surgery at the L5-S1 level.  (Tr. 36-37.)  He is currently having back problems related to a ruptured disc, for which he is supposed to have surgery.  (Tr. 37.)  He takes Hydrocodone for the pain and has taken Oxycodone and Darvocet in the past for pain.  (Tr. 37-38.)  Often, he "just put[s] up with the pain" because "[w]hen your whole body hurts like that. . . [there is not] much you can do about it."  (Tr. 37-38.)  Mr. Barth has had carpal tunnel surgery on both hands twice and needs to have the surgery again on the right hand.  (Tr. 38.)  The carpel tunnel surgery affects Mr. Barth's

ability to use his hands and arms.  (Tr. 40-41.)  Mr. Barth experiences numbness as a result of the

carpal tunnel syndrome that prevents him from swinging a hammer or opening a jar with his

right hand.  (Tr. 41.)  He used to use a computer but no longer does so because his hand bothers

him; sitting with his hands out in front of him like he would with a keyboard puts pressure on his

hand that bothers him.  (Tr. 54-55.)  Mr. Barth's right knee replacement "went quite well"; he

experiences some difficulty with knee stiffness and when climbing stairs.  (Tr. 43.)  Mr. Barth

experiences one severe migraine headache per month, as a result of which he has blurred vision

and his headache is so bad that he wants to be in a dark room and he cannot do anything.  (Tr.

48.)  He also has less severe headaches, which he described as "constant headache all the time,"

that last five to six days.  (Tr. 50-51.)  Mr. Barth takes Topamax for the migraines.  (Tr. 49.)  Mr.

Barth has degenerative heart disease with blockage in four arteries and experiences chest pain

and shortness of breath with over-exertion, for example, when climbing stairs.  (Tr. 52-53.)

With respect to his limitations, Mr. Barth testified that he could lift 10 pounds at most;

stand for 30 to 45 minutes at a time; walk one block without any pain; and sit for 30 minutes to

forty-five minutes or an hour at a time, depending on the chair.  (Tr. 40.)

With respect to his daily activities, Mr. Barth testified that he watches TV and reads.  (Tr.

41.)  He cooks some meals using the microwave and cleans up afterwards.  (Tr. 41.)  He does

laundry and does "very little" grocery shopping, which is primarily done by his daughters.  (Tr.

41-42.)  Mr. Barth attends church.  (Tr. 42.) Mr. Barth testified that he was no longer able to

engage in such hobbies as hunting and fishing because of his impairments.  (Tr. 42.)

### C.   Residual Functional Capacity Assessment

Dr. Aaron Mark completed a physical residual functional capacity assessment of Mr.

Barth on July 22, 2008.  (Tr. 381-88.)  The residual functional capacity assessment found as

follows: Mr. Barth can lift 20 pounds occasionally and 10 pounds frequently; he can stand, walk,

or sit about six hours in an eight-hour work day, with normal breaks; his ability to push or pull is

limited in the upper extremities; he can climb a ramp or stairs frequently; he can never climb a

ladder, rope, or scaffold; he can balance and crawl frequently; he can stoop, kneel, or crouch

occasionally; he is limited in his ability to reach in all directions, including overhead; he is

unlimited in his ability to handle, finger, and feel; he has no visual or communicative

limitations; and he should avoid even moderate exposure to hazards, such as machinery or

heights.  (Tr. 381-88.)

### D.    Vocational Expert's Testimony

At the administrative hearing, the ALJ posed two hypotheticals to David Perry, a

vocational expert, the second of which was as follows:

> [L]et's assume an individual of the claimant's age, education and past work
> experience who has a residual functional capacity to sit, stand and walk
> throughout an eight hour day with an opportunity to alternate positions after 30
> minutes in any one position and then can remain in the next position up to 30
> minutes, is limited to lifting to 10 pounds frequently and 20 pounds occasionally,
> should never climb up ladders, rope or scaffolds, can frequently climb ramps or
> stairs, balance and crawl but should only occasionally stoop, kneel or crouch.  The
> individual should limit reaching overhead to occasional and should avoid even
> moderate exposure to work hazards.

(Tr. 63-64.)  Mr. Perry testified that such an individual could perform the work of a telemarketer

or a telemarketer supervisor, both as Mr. Barth had performed them and as generally performed

in the economy.  (Tr. 64.)  The ALJ's first hypothetical assumed a residual functional capacity as

described by Dr. Mark's residual functional capacity assessment and differed from the second

hypothetical in that it assumed an ability "to sit, stand and walk about six hours of an eight hour

day with normal breaks."  (Tr. 62-63.)

Mr. Barth's attorney asked Mr. Perry to assume an individual with the same restrictions as posed by the ALJ, but who could not climb stairs.  (Tr. 66-67.)  Mr. Perry testified that such a limitation would not preclude work as a telemarketer or telemarketer supervisor.  (*See* Tr. 67.) Mr. Barth's attorney also asked Mr. Perry to assume an individual who could not use a keyboard frequently.  (Tr. 68.)  Mr. Perry testified that such an individual would not be able to perform the telemarketer or telemarketer supervisor jobs.  (Tr. 68.)  In addition, Mr. Barth's attorney asked Mr. Perry to assume an individual who was required to change postural positions between sitting, standing, and walking every 20 minutes.  (Tr. 68-69.)  Mr. Perry testified that such a restriction would interrupt the individual's ability to perform the telemarketer and telemarketer supervisor positions.  (Tr. 68-69.)

## III.   PROCEDURAL HISTORY AND ALJ'S DECISION

Mr. Barth applied for DIB and SSI on May 19, 2008, alleging an inability to perform any substantial gainful activity since February 13, 2008 due to his disabling conditions.[2]  (Tr. 127-41.)  The applications were denied by the Commissioner initially on July 23, 2008 (Tr. 72-73) and upon reconsideration on September 15, 2008.  (Tr. 74-75.)  Thereafter, Mr. Barth filed a written request for a hearing.  (Tr. 95.)  The hearing was held on December 15, 2009.  (Tr. 32.)

On January 29, 2010, ALJ Hallie E. Larsen denied Mr. Barth's application for DIB and SSI benefits.  (Tr. 10-21.)  The ALJ concluded that Mr. Barth is not disabled under sections 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act.  (Tr. 13-21.)  The ALJ found that Mr. Barth has not engaged in substantial gainful activity since February 13, 2008, the alleged onset date.  (Tr. 15.)  The ALJ also found that Mr. Barth has the following severe impairments: a history of migraine headaches; degenerative disc disease, status post fusion at L5-S1; right

---

[2]     Mr. Barth previously applied for DIB benefits in January 1991, December 2003, October 2004, and April 2006.  (Tr. 173.)  All the claims were denied.  (Tr. 173.)

rotator cuff tear, status post arthroscopic repair; degenerative joint disease right knee, status post total knee replacement; carpal tunnel syndrome, bilateral, status post bilateral carpal tunnel release; and ischemic heart disease. (Tr. 15.) The ALJ determined that Mr. Barth does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404.1567(b). (Tr. 16.) The ALJ concluded that Mr. Barth has the residual functional capacity to perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), including the ability to frequently lift and/or carry 10 pounds; occasionally lift and/or carry 20 pounds; sit, stand, and walk throughout an 8-hour workday with the opportunity to alternate positions after 30 minutes in any one fixed position; frequently climb stair and ramps and balance and crawl; occasionally stoop, kneel, or crouch, but never climb ladders, ropes, or scaffolds; occasionally reach overhead; and avoid even moderate exposure to work hazards. (Tr. 16.) The ALJ found that Mr. Barth's medically-determinable impairments could reasonably be expected to cause his alleged symptoms, but that Mr. Barth's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible. (Tr. 17.) The ALJ concluded that Mr. Barth is capable of performing past relevant work as both a telemarketer and telemarketer supervisor, and as a result, Mr. Barth has not been under a disability from February 13, 2008 through the date of the decision. (Tr. 20-21.)

On May 26, 2010, the Appeals Council denied Mr. Barth's request for review (Tr. 4), making the ALJ's decision final for the purposes of judicial review. *See* 20 C.F.R. §§ 404.967, 404.981. This Court has jurisdiction to review the decision of the ALJ. 42 U.S.C. § 405(g).

Mr. Barth filed the present Complaint on February 7, 2011. (Docket No. 1.) Mr. Barth moved for summary judgment on September 23, 2011. (Docket No. 16.) The Commissioner moved for summary judgment on November 4, 2011. (Docket No. 19.)

## ANALYSIS

### I.       LEGAL FRAMEWORK

To be entitled to DIB and SSI, a claimant must be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1).  A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.

The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.  20 C.F.R. §§ 404.1520(a)(5)(i)-(v); 416.920(a)(4)(i)-(v).  The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner.  *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Ordinarily, the Commissioner can rely on the testimony of a vocational expert to satisfy its burden.  *Long v. Chater*, 108 F.3d 185, 188 (8th Cir.1997).

### II.      STANDARD OF REVIEW

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole. . .requires a more scrutinizing analysis." *Id.* (quotation omitted).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213.  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199.  Therefore, even if Mr. Barth's impairments support a claim for disability insurance benefits, the Court must affirm if there is substantial evidence to support the ALJ's conclusion to the contrary. *Flynn v. Chater,* 107 F.3d 617, 620 (8th Cir. 1997).  This Court cannot reverse the Commissioner's decision "merely because substantial evidence exists in the record that would have supported a contrary outcome." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

## III.    REVIEW OF THE ALJ'S DECISION

Mr. Barth contends that the ALJ's determination is unsupported by substantial evidence because the ALJ erred in concluding that his testimony was not credible.  (Pl. Mem. 4.)  Mr. Barth argues that the objective medical evidence taken as a whole substantiates the persistence, intensity, and limiting effects of his impairments, particularly with respect to Mr. Barth's back impairment and carpel tunnel syndrome.  (Pl. Mem. 4-12.)  Mr. Barth also contends that the

ALJ's determination is not supported by substantial evidence because the hypothetical submitted

to the vocational expert discredited Mr. Barth's testimony.  (Pl. Mem. 12-13.)  Specifically, Mr.

Barth argues that the hypothetical did not include appropriate limitations due to Mr. Barth's right

recurrent carpal tunnel syndrome and a limitation of changing positions between sitting,

standing, and walking every 20 minutes.  (Pl. Mem. 12-13.)

### A.      Mr. Barth's Credibility

This Court "defer[s] to the ALJ's determinations regarding the credibility of testimony,

so long as they are supported by good reasons and substantial evidence."  *Guilliams v. Barnhart*,

393 F.3d 798, 801 (8th Cir. 2005).  "The credibility of a claimant's subjective testimony is

primarily for the ALJ to decide, not the courts."  *Holmstrom v. Massanari,* 270 F.3d 715, 721

(8th Cir. 2001).  In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's

daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and

aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any

functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The claimant's

work history and the absence of objective medical evidence to support the claimant's complaints

are also relevant.  *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008).  "An ALJ who rejects

[subjective] complaints must make an express credibility determination explaining the reasons

for discrediting the complaints."  *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000).  The ALJ

need not explicitly discuss each factor.  *Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir. 2005).  "It

is sufficient if he acknowledges and considers [the] factors before discounting a claimant's

subjective complaints."  *Id.* (quotation omitted).

The ALJ concluded that, although Mr. Barth's medically-determinable impairments

could reasonably be expected to produce his symptoms, Mr. Barth's statements concerning the

intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment.  (Tr. 17.)  In making her credibility determination, the ALJ cited two factors as particularly probative: that Mr. Barth's activities of daily living were inconsistent with his allegations and that the medical evidence of record was inconsistent with his allegations.  This Court concludes that the ALJ's credibility determination is not supported by substantial evidence on the record as a whole for the reasons discussed below.

>    1.   Mr. Barth's daily activities

The ALJ relied on Mr. Barth's testimony that he does some cooking and cleans up afterwards, does his own laundry, and does some grocery shopping.  (Tr. 18.)  The ALJ also noted that Mr. Barth attends church and occasionally ushers.  (Tr. 18.)  However, the fact that Mr. Barth "tries to maintain [his] home and does [his] best to engage in ordinary life activities is not inconsistent with [his] complaints of pain, and in no way directs a finding that [he] is able to engage in light work."  *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005).  In *Draper v. Barnhart*, the Eighth Circuit found that the plaintiff's light exertional activities, such as household chores, laundry, grocery shopping, and mowing the lawn were not substantial evidence of inconsistency with the claimant's allegations of pain and did not prove the lack of a disability.  *See also Baumgarten v. Chater*, 75 F.3d 366, 369 (8th Cir. 1996) (making bed, preparing food, performing light housekeeping, grocery shopping, and visiting friends were not substantial evidence of the ability to do full-time, competitive work); *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) ("The ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity.").

The ALJ also found the fact that Mr. Barth had done some carpentry work after the alleged disability on-set date was inconsistent with his stated limitations.  (Tr. 18.)  However, "[a]n ALJ should not penalize a claimant who, prior to an award of benefits, attempts to make ends meet by working in a modest, part-time job."  *Cline v. Sullivan,* 939 F.2d 560, 565–66 (8th Cir.1991).  The record indicates that Mr. Barth "tried to work a few hours in July 2008 and September 2008 but had to stop due to [] disability."  (Tr. 198.)  Mr. Barth testified, "I tried working small jobs here and there. . .because I couldn't get no help with anything," that he was "trying to make ends meet," and that his attempts to work were not successful because he was "in so much pain."  (Tr. 34.)  Mr. Barth's unsuccessful attempts to work are not inconsistent with his stated limitations and may actually support his allegations of disabling pain.  *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 (9th Cir. 2007) ("It does not follow from the fact that a claimant tried to work. . .and, because of his impairments, *failed,* that he did not then experience pain and limitations severe enough to preclude him from *maintaining* substantial gainful employment. Indeed, we have suggested that similar evidence. . .actually *supported* his allegations of disabling pain.").  The record indicates that Mr. Barth tried to work for brief periods out of economic necessity, but was unable to maintain his employment due to his impairments.  "Under these circumstances, it is at least as likely that [Mr. Barth] tried to work in spite of his symptoms, not because they were less severe than alleged."  *Lingenfelter*, 503 F.3d at 1039.

In addition, the ALJ pointed to medical records containing references to activities she found inconsistent with the severity of Mr. Barth's stated limitations, such as repairing a window on his home and assisting a friend with a basement repair.  (Tr. 18.)  As discussed above, the fact that Mr. Barth tried to maintain his home is not inconsistent with his complaints of pain.  Further,

the fact that Mr. Barth had to seek medical treatment after attempting to engage in such activities indicates his inability to successfully complete the tasks.

For the reasons discussed above, the Court finds that the ALJ's determination that Mr. Barth's daily activities are not consistent with his stated limitations is not supported by substantial evidence.

### 2.    The objective medical evidence

"Although not a factor under *Polaski*, an ALJ can rely upon objective medical evidence which corroborates a claimant's allegations of pain to find in favor of a claimant, but objective medical evidence is not needed to support subjective testimonial evidence of pain and an ALJ may not base a denial of benefits solely on a lack of objective medical evidence." *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir. 1991) (citing *Polaski v. Heckler,* 751 F.2d 943, 953 (8th Cir.1984); *Tome v. Schweiker,* 724 F.2d 711, 713 (8th Cir.1984)).

Here, the medical evidence is sufficiently convincing and consistent with Mr. Barth's claims of the intensity and limiting effects of his impairments with respect to his back impairment and carpal tunnel syndrome that substantial evidence does not support the ALJ's adverse credibility determination.  Mr. Barth has had a series of six surgeries on his back to address his impairment and a spinal surgeon has concluded that he is in need of a seventh surgery.  (Tr. 280, 392, 412-13.)  Mr. Barth was treated regularly for back pain and related radiating leg pain throughout the relevant period by his physician, a chiropractor, and an orthopedic spine specialist.  (*See supra* pp. 4-7.)  April 2009 MRI imaging showed a disc protrusion at L4-L5, with possible compression of the traversing right L5 nerve root, mild to moderate multilevel degenerative disc and facet changes throughout the lumbar region, and multilevel mild disc bulging.  (Tr. 428-29.)  With respect to Mr. Barth's carpal tunnel syndrome,

Mr. Barth has had carpal tunnel release surgery performed on both hands twice and is in need of a third procedure on his right hand.  (Tr. 329, 468.)  Mr. Barth's physician noted swelling, triggering of the fourth finger, and loss of grip strength.  (Tr. 474, 490-91.)  November 2009 testing revealed that Mr. Barth's right median motor responses were no better than prior to his 2007 carpal tunnel release surgery.  (Tr. 422-23.)

In light of the ample medical record evidencing Mr. Barth's long history of lower back impairment, including degenerative disc disease and transitional syndrome, and recurrent carpal tunnel disease, the ALJ's reliance on the objective medical evidence does not support the ALJ's adverse credibility determination.  The ALJ's conclusion that Mr. Barth's statements concerning the intensity, persistence, and limiting effects of his symptoms were inconsistent with the medical evidence of record is not supported by substantial evidence.  The Court agrees with Mr. Barth that the objective medical evidence supports his complaints with respect to his lower back impairment and carpal tunnel syndrome.

3.    Other *Polaski* factors

Other *Polaski* factors not specifically evaluated by the ALJ also weigh in favor of Mr. Barth's credibility.

*Duration, frequency, and intensity of pain*.  A review of the record shows that Mr. Barth regularly complained of varying degrees of pain related to his lower back impairment throughout the relevant period.  (*See, e.g.*, Tr. 221, 252, 257, 280, 412, 419, 495, 503.)

*Dosage, effectiveness, and side effect of medication*.  The evidence indicates that Mr. Barth has persistently sought medical care and has continually been taking prescription medication for relief of pain.  (*See, e.g.*, Tr. 182, 234, 242.)  Mr. Barth testified that he was currently taking Hydrocodone for pain and had also taken Oxycodone and Darvocet for pain.

(Tr. 37-38.)  Mr. Barth also was prescribed anti-inflammatory medications related to his lower back impairment.  (Tr. 257.)  Mr. Barth was prescribed Diclofenac for his hand issues.  (Tr. 491.)

*Precipitating and aggravating factors*.  The medical evidence shows that Mr. Barth consistently complained that certain forms of physical exertion caused him lower back pain, such as walking, bending, and sitting.  (*See, e.g.*,  Tr. 221, 281, 419-21, 503.)

*Functional limitations.*  The physician who performed Mr. Barth's last back surgery imposed permanent work restrictions limiting him to working 4-8 hours per day; lifting 25-50 pounds; sitting, standing, and walking intermittently; and changing positions every 20 minutes. (Tr. 409-10.)

**B.      The ALJ's Residual Functional Capacity Determination**

Mr. Barth does not raise residual functional capacity ("RFC") as an express argument, but he does disagree with the ALJ's finding on the issue.  (Pl. Mem. 5-9.)  Mr. Barth argues that the ALJ's RFC determination did not account for medical evidence regarding his lower back injury and carpal tunnel syndrome dating after Dr. Mark's July 2008 RFC assessment.  (Pl. Mem. 8-9.)

In steps four and five, the Commissioner assesses an individual's RFC.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  RFC is defined as the most a claimant can do despite the limitations of the individual's impairments.  20 C.F.R. § 404.1545(a)(1).

Here, the ALJ concluded that Mr. Barth has the RFC to perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), including the ability to frequently lift and/or carry 10 pounds; occasionally lift and/or carry 20 pounds; sit, stand, and walk throughout an 8-hour workday with the opportunity to alternate positions after 30 minutes in any one fixed position; frequently climb stair and ramps and balance and crawl; occasionally stoop, kneel, or

crouch, but never climb ladders, ropes, or scaffolds; occasionally reach overhead; and avoid even moderate exposure to work hazards.  (Tr. 16.)

The ALJ noted that Mr. Barth's back impairment was one basis for limiting him to a range of light work, but found that further restrictions were not warranted based on his back impairment.  (Tr. 19.)  The ALJ found it significant that Mr. Barth had returned to work as a carpenter subsequent to his last back surgery in 2002.  (Tr. 19.)  The ALJ gave some weight to a 2004 opinion from Dr. Holt, who had performed Mr. Barth's most recent back surgery.  (Tr. 19.) Dr. Holt completed a work ability report recommending permanent work restrictions for Mr. Barth following his last back surgery, including sitting for no more than 20 minutes at a time, and sitting, standing, and walking intermittently.  (Tr. 410.)  The ALJ concluded that Mr. Barth needed to change positions intermittently as Dr. Holt recommended, but that a reasonable frequency of position changes was 30 minutes based on Mr. Barth's testimony that he could sit and stand for 30-45 minutes at a time.  (Tr. 19, 40.)  With respect to Mr. Barth's carpal tunnel syndrome, the ALJ imposed no limitations to the RFC.  (Tr. 19-20.)  The lack of limitations was based on the only recent recurrence of Mr. Barth's carpal tunnel syndrome prior to the hearing. (Tr. 19-20.)

The ALJ's RFC determination that Mr. Barth's back condition did not warrant further restrictions is not supported by substantial evidence on the record as a whole.  Although Mr. Barth testified that he could stand for up to 30-45 minutes and sit for 30-45 minutes, depending on the type of chair, that does not necessarily mean that he could do so throughout an 8-hour work day, day after day.  "To find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the

real world." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989). Here, the objective medical evidence supports the permanent work restrictions imposed by Mr. Barth's treating physician limiting him to sitting for no more than 20 minutes at a time and sitting, standing, and walking intermittently. Mr. Barth's testimony is not inconsistent with those restrictions. Mr. Barth testified that because his work as a telemarketer was arranged through workers' compensation, the company allowed him the flexibility to sit, walk, and stand for no greater than 20 minutes at a time consistent with Dr. Holt's restrictions, and also provided him with a recliner. (Tr. 45.) He further testified that it was necessary to sit in the recliner due to his back pain. (Tr. 45.)

In addition, the ALJ's reliance on Mr. Barth's return to carpentry following his last back surgery in 2002 is misplaced. The medical record indicates that Mr. Barth had done well after his 2002 surgery until late 2007, at which time he developed severe pain as discussed above. (Tr. 257, 280.) Mr. Barth stopped working as a carpenter due to his impairments shortly after this onset of back pain. Further, an orthopedic spine surgeon has concluded that Mr. Barth's back condition has deteriorated to the point of warranting additional surgery. (Tr. 392, 412-13.) On remand, the ALJ should assess appropriate limitations to the RFC for Mr. Barth's back impairment consistent with this order.

The ALJ's conclusion that Mr. Barth's recurrent carpal tunnel syndrome did not warrant any functional restrictions also is not supported by substantial evidence. Mr. Barth testified that his carpel tunnel disease causes numbness, that he is unable to swing a hammer, and unable to open a jar with his right hand. (Tr. 41.) The medical evidence supports Mr. Barth's testimony. As discussed above, 2009 testing revealed that Mr. Barth's right median motor responses indicated a need for a third carpal tunnel release surgery and Mr. Barth's physician noted swelling, finger deformity, triggering of the fourth finger, and loss of grip strength. (Tr. 422-23,

474, 490-91.)  The RFC determination does not account for these limitations.  Contrary to the ALJ's finding, substantial evidence supports the imposition of functional limitations due to Mr. Barth's recurrent carpal tunnel syndrome.  On remand, the ALJ should assess appropriate limitations to the RFC for Mr. Barth's carpal tunnel syndrome consistent with this order.

Mr. Barth also argues that the ALJ erred in finding that he sought only minimal treatment for his migraine headaches during the relevant period.  (Pl. Mem. 10.)  The record shows that Mr. Barth sought treatment in May through July 2008 for migraines and syncope.  (Tr. 222, 238, 529.)  Dr. Mark's RFC assessment specifically considered the evidence of headaches and syncope and assessed restrictions against climbing ladders, ropes, or scaffolds and against exposure to hazards.  (Tr. 382-83, 385.)  In addition, as the ALJ noted, Mr. Barth's medical history indicates that his headaches are often under control with medication.  (Tr. 275, 277.)  Moreover, between July 2008 and when the administrative hearing took place on December 15, 2009, the record does not reflect any further treatment for migraines.  The ALJ's determination that Mr. Barth sought minimal treatment for migraines during the relevant period therefore is supported by substantial evidence.  The ALJ reasonably concluded that the medical evidence did not show the necessity for migraine-related restrictions beyond those recommended by Dr. Mark and included in the ALJ's RFC determination.  (Tr. 19.)

C.      **The ALJ's Conclusion that Mr. Barth Can Perform His Past Work**

In step four, the Commissioner assesses an individual's RFC to determine if the individual's condition precludes him or her from performing the individual's past work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The ALJ relied upon the testimony of the vocational expert and determined that Mr. Barth's past relevant work as a telemarketer and telemarketer supervisor is within the parameters of Mr. Barth's RFC.  (Tr. 20-21.)

"[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work. . . ." 20 C.F.R. § 404.1560(b)(2).  A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant.  *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994).  "A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence." *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (quotation omitted).  "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994).  However, "[vocational expert t]estimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision."  *Id.* (citing *Rappoport v. Sullivan*, 942 F.2d 1320, 1323 (8th Cir. 1991)).

Mr. Barth contends that the ALJ's determination is not supported by substantial evidence because the hypothetical submitted to the ALJ discredited Mr. Barth's testimony.  (Pl. Mem. 12-13.)  Specifically, Mr. Barth argues that the hypothetical did not include appropriate limitations due to Mr. Barth's right recurrent carpal tunnel syndrome and a limitation of changing positions between sitting, standing, and walking every 20 minutes.  (Pl. Mem. 12-13.)

The Court agrees.  As discussed above, substantial evidence supports a functional restriction limiting Mr. Barth to sit, stand, and walk intermittently with the opportunity to change positions every 20 minutes, consistent with the permanent work restrictions imposed by Mr. Barth's treating physician.  In addition, as discussed above, substantial evidence supports a

limitation due to Mr. Barth's carpal tunnel syndrome. Because the ALJ's hypothetical posed to the vocational expert did not include all appropriate functional limitations, it is not substantial evidence to support the ALJ's decision.

At the administrative hearing, Mr. Barth's attorney asked the vocational expert to assume an individual with the same restrictions as the RFC found by the ALJ, but who also could not use a keyboard frequently due to right hand pain and numbness. (Tr. 68.) Mr. Barth's attorney also asked the vocational expert to assume an individual who was required to change postural positions every 20 minutes between sitting, standing, and walking. (Tr. 68-69.) The vocational expert testified that an individual with such restrictions would not be able to perform the telemarketer or telemarketer supervisor jobs. (Tr. 68-69.) The ALJ's determination did not take into account this testimony by the vocational expert.

Therefore, this Court concludes that the ALJ's conclusion that Plaintiff can perform his past relevant work as a telemarketer and telemarketer supervisor is not supported by substantial evidence on the record as a whole.

## IV.    WHETHER MR. BARTH CAN ADJUST TO OTHER WORK

In step five, the Commissioner assesses an individual's "RFC" to determine if the individual's condition precludes him or her from making an adjustment to work other than the individual's past work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The ALJ resolved Mr. Barth's claim at step four by finding he could engage in past relevant work as a telemarketer or telemarketer supervisor, and never considered whether Mr. Barth could make an adjustment to other work. (*See* Tr. 20-21.) Because the ALJ's decision at step four that Mr. Barth can perform his past relevant work was erroneous, the case should be remanded for further proceedings so that the ALJ can move on to step five of the sequential

evaluation.  The step-five analysis should take into account all of Mr. Barth's functional limitations consistent with this opinion.

## **<u>RECOMMENDATION</u>**

For the foregoing reasons, **IT IS HEREBY RECOMMENDED THAT:**

1.      Plaintiff's Motion for Summary Judgment [Docket No. 16] be **GRANTED IN PART and DENIED IN PART;**

2.      Defendant's Motion for Summary Judgment [Docket No. 19] be **DENIED**;

3.      The case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Recommendation; and

4.      Judgment be entered accordingly.

Dated: April 9, 2012                                    s/ Arthur J. Boylan
                                                        Chief Magistrate Judge Arthur J. Boylan
                                                        United States District Court

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before   April 23  , 2012.